# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT GREENVILLE

| | |
|---|---|
| BARBARA KRIEGER,<br><br>        Plaintiff,<br><br>v.<br><br>WALMART STORES EAST, L.P.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)  No. 2:24-CV-171<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

Before the Court is a motion for summary judgment filed by Defendant Wal-Mart Stores East, LP ("Wal-Mart"), which is supported by a brief, documents referenced therein, and a statement of material facts. [Docs. 49-52]. Plaintiff Barbara Krieger ("Plaintiff") filed a response in opposition, along with a brief, documents in support, a response to Wal-Mart's statement of material facts, and a statement of facts that Plaintiff asserts are disputed. [Docs. 62-65]. Wal-Mart filed a reply. [Doc. 66]. Wal-Mart's motion is now ripe for resolution. For the reasons stated below, Wal-Mart's Motion for Summary Judgment [Doc. 49] is **DENIED**.

## I.      FACTUAL BACKGROUND

The dispute in this matter stems from an incident that occurred in the vestibule of Wal-Mart store number 678 located at 1075 Cosby Highway, Newport, Tennessee on or about December 1, 2023, during the busy Christmas shopping season. [Doc. 60; Doc. 50-1 p. 28; Doc. 50-4 p. 66]. It was raining that day and "everything was wet." [Doc. 64]. Plaintiff and her husband went to Wal-Mart to do some shopping. [Doc. 64].

Surveillance video shows that Plaintiff walked through one of the two doors leading into Wal-Mart's vestibule and across floor mats placed at that door. [Doc. 65]. There are four doors leading to the vestibule where the incident occurred, two connecting the vestibule to the outside and two leading into the store. [Doc. 64]. Mats were placed inside the vestibule at the 'entry' door leading from the outside into the vestibule where Plaintiff and her husband entered. [Doc. 65]. However, mats had not been placed at the 'exit' door where people typically exit the store into the vestibule after completing their shopping. [Doc. 65]. Additionally, there were no "caution- wet floor" signs in the vestibule at the time of Plaintiff's fall. [Doc. 50-3 p. 265]. After walking across the mats, Plaintiff stepped off the mats into the center of the vestibule. [Doc. 64]. Plaintiff was moving through the center area of the vestibule near the 'exit' door with no mats when she fell. [Doc. 64]. Plaintiff's expert witness, Ryan Radebach, opined that if there had been water on the rain boots Plaintiff was wearing that water likely would have been absorbed by the mat Plaintiff walked across as she entered the vestibule. [Doc. 63-13 p. 205]. He further opined that the liquid substance that Plaintiff slipped on would have been different from any water she had on the bottom of her boots when she first entered the vestibule. [Doc. 63-13 p. 205].

Plaintiff's husband, who was walking just slightly ahead of Plaintiff, did not see the beginning of Plaintiff's fall. [Doc. 64]. He heard a sliding sound and then out of the corner of his eye saw Plaintiff slide across the floor approximately five to six feet before falling. [Doc. 64]. Plaintiff fell on to the floor face first. [Doc. 60]. Her right shoulder and head hit the floor, and a Wal-Mart sign fell onto her head. [Doc. 60].

Mr. Krieger testified that when he saw his wife "sliding across the floor into a sign" he stopped, took his hand off the shopping cart, and then took the sign off her. [Doc. 50-2 p. 23-24]. Mr. Krieger then held his wife and called his wife's name multiple times before she responded.

[Doc. 50-2 p. 23-24]. Mr. Krieger testified that he saw water on the floor while he was holding his wife. [Doc. 50-2 p. 23-24]. He further advised that "I wouldn't say there were puddles, but you could tell the floor was wet.  It has a sheen to it. I mean, if you wash your floors at home with a mop, you know what it looks like when it's damp. But these were - - you could see there was just little pockets of water on the floor." [Doc. 50-2 p. 32]. When asked if the sheen was a foot long, Mr. Krieger stated that "[i]t could have been. It could have been six inches long. The floor was wet all in that area." [Doc. 50-2 p. 32]. He further testified: "when I picked her up and put her in my arms, I looked down and - - I wanted to make sure, you know, she wasn't bleeding or anything. I could see that the floor was wet." [Doc. 50-2 p. 45]. When asked about his wife sliding and if he saw "any water in a - - like a trail of water?" [Doc. 50-2 p.53]. Mr. Krieger stated: "I didn't see a trail of water, but I saw that the floor was wet." [Doc. 50-2 p. 53].

Plaintiff described the fall stating: "all of a sudden, I found myself slipping on the floor, flying and falling down."  [Doc. 50-1 p. 68-69]. She further testified "I just flew.  I couldn't stop." [Doc. 50-1 p. 69]. Plaintiff stated:

> I didn't trip, because to me, when you trip, you can - - even if you lose a little bit of balance, you can come back to the balance. This wasn't a trip, this was sliding and I was on the water, because the way that I fell, I flew. I didn't just trip, I just flew and I kept going.

[Doc. 50-1 p. 84-85].

After Plaintiff fell, another customer offered assistance by retrieving an electric cart from outside for Plaintiff to sit on. [Doc. 64]. The electric cart had been sitting out in the rain and was wet. [Doc. 64-1 p. 79]. Plaintiff sat on the noticeably wet cart while an incident report was completed. [Doc. 64].

Wal-Mart employee Kassi Belcher prepared an Associate Witness Statement regarding the incident. [Doc. 50-11]. Ms. Belcher was not on the scene when Plaintiff fell and was not the first Wal-Mart employee to arrive on the scene. [Doc. 63-17 p.101]. The witness statement signed by Ms. Belcher states: "The customer said she thought she slipped on her rainboots." [Doc. 50-11]. Plaintiff testified, however, that she does not believe that she ever told Ms. Belcher that she slipped on her boots. [Doc. 50-1, p. 83]. After the wet cart was brought in for Plaintiff to sit on, Ms. Belcher took photographs to accompany the witness statement. [Doc. 63-17 p. 98].

Walmart maintains an Inclement Weather Guideline to prevent slip hazards during rain and a Floor Mat Program that identifies four types of mats including a carpeted mat, also called a wet mat, designed to absorb liquids to prevent slip and fall incidents in wet locations to be used in the store. [Doc. 63-5; Doc 63-6]. Ms. Belcher testified about the Wal-Mart maintenance team's responsibilities for placing mats in the vestibule. [Doc. 63-17 p. 43-44]. She admitted that the vestibule "does get really slick in there without rugs. So, it is easy to slip and fall . . .." [Doc. 63-17 p. 25-26]. The surveillance video shows that mats were placed in the vestibule at the door where Plaintiff first entered but that no mats were placed at the door near where Plaintiff fell. [Doc. 65]. Ms. Belcher testified that mats were supposed to be placed flush with the door so that a customer's first step would be on to the mat and not the tile. [Doc. 63-17 p. 44-45]. "So that way, you got a carpeted path all the way into the store, past the cart return." [Doc. 63-17 p. 80]. Ms. Belcher testified that mats should also have been placed in the same manner between the exit doors so that there would have been carpeted mats all the way between the two exit doors. [Doc. 63-17 p. 80-81].

Ms. Belcher agreed that she had been trained to know that any amount of water on the floor could make the surface slippery and that someone could fall in just a couple of drops of water.

[Doc. 63-17 p. 54-55 and p. 32]. Based on her experience, Ms. Belcher testified that water on the tile in the vestibule can create a significant slip risk. [Doc. 63-17 p. 61]. When asked if water dripping from umbrellas could cause an unsafe condition in the vestibule, Ms. Belcher said: "Yeah, it could cause a slip and fall." [Doc. 63-17 p. 73]. Wal-Mart employee April Winstead also testified that a small amount of water on the vestibule floor could cause the floor to be slippery and pose a hazard. [Doc. 50-3 p. 235].

Plaintiff also notes that within the year preceding Plaintiff's fall, two similar incidents were reported. [Doc. 50-3 p. 84]. On December 9, 2022, and again on December 11, 2022, customers alleged that they had slipped in the Wal-Mart vestibule in water on the floor due to rain. [Doc. 50-3, p. 84].

The door near where Plaintiff fell had a 'Do Not Enter' sign on it. [Doc. 63-17 p. 59]. Despite this sign, the surveillance video shows nine people, some of whom were Wal-Mart employees, entering through the door marked 'Do Not Enter.' [Doc. 65]. One of Defendant's training videos also shows someone entering through an exit door. [Doc. 63-13 p.185]. Three Wal-Mart employees[1] testified that it was foreseeable for customers to enter through the door marked 'Do Not Enter.' [Doc. 50-3 p. 254; Doc. 63-17 p. 81-82; Doc. 50-4 p. 76]. Ms. Belcher was asked the purpose of having mats placed between the exit doors, and she explained "We have people that sometimes come in the out door, so that way they're covered both ways." [Doc. 63-17 p. 81-2]. Ms. Belcher stated that Wal-Mart would place mats at the exit door "Just in case they come in that door. You never know what door they're going to come in, and you don't want them to slip and

---

[1] One of these, Ms. Belcher, was an employee at the time of Plaintiff's fall but is no longer employed by Wal-Mart.

fall." [Doc. 63-17 p. 82]. Wal-Mart does not have its employees stop people from entering through the exit door. [Doc. 50-3 p. 254].

Wal-Mart employee Serrita Clevenger, who was working as an asset protection customer host on the day of the incident, testified that she was the first Wal-Mart employee on the scene after Plaintiff fell. [Doc. 50-4 p. 17-18 and 39; Doc. 64]. Ms. Clevenger arrived on the scene less than ten seconds after the fall. [Doc. 50-4 p. 39]. Ms. Clevenger, however, did not witness the fall. [Doc. 50-4 p. 41]. The area where Ms. Clevenger was stationed when the fall occurred was inside the store near the exit doors. [Doc. 50-4 p. 35].

Wal-Mart has guidelines that make all associates responsible for conducting periodic visual safety sweeps to look for potential hazards such as spills or debris and address any hazards as part of their regular work activities. [Doc. 64]. Wal-Mart associates are expected to follow Wal-Mart's "clean as you go" practice, which trains that when a liquid on the floor is encountered, the associate is expected to clean it up immediately or guard the area and summon assistance until it is cleaned. [Doc. 64]. Walmart also has a "towel in pocket" program encouraging associates to carry a towel so that they may wipe up any spill they see. [Doc. 63-8].

The surveillance video shows that approximately eleven minutes prior to Plaintiff's fall, Ms. Clevenger crossed through the center of the vestibule. [Doc. 50-3 p. 230]. The video shows Ms. Clevenger hugging someone and then entering the vestibule and crossing through the center to catch the buggy pusher. [Doc. 50-3 p. 101-103]. Ms. Clevenger saw no water on the floor but agreed that she was distracted because she had just hugged a friend and was focused on yelling at the buggy pusher to keep him focused on his task. [Doc 50-3 p. 104].

In its motion [Doc. 49], Wal-Mart alleges that there are multiple reasons it is entitled to summary judgment. More specifically, Wal-Mart contends that Plaintiff cannot meet her burden to show that a dangerous condition existed at the time of her fall, that any dangerous condition was the cause of her fall, that Wal-Mart created any dangerous condition, and that Wal-Mart had prior notice of any dangerous condition. [Doc. 49 p. 1]. Wal-Mart concludes by contending that no reasonable jury could conclude that Plaintiff was less than 50% at fault. *Id.*

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 sets forth the standard governing summary judgment, providing that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the case under the applicable substantive law, and an issue is 'genuine' if the evidence is 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Koshani v. Barton*, 374 F. Supp. 3d 695, 701 (E.D. Tenn. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Dugger v. American Water Heater Co.*, No. 2:18-CV-00185-SKL, 2020 WL 12862727, at *5 (E.D. Tenn. July 23, 2020) ("A 'genuine' dispute exists with respect to a material fact when the evidence would enable a reasonable jury to find for the non-moving party." (citing *Anderson*, 477 U.S. at 248; *Jones v. Sandusky Cty., Ohio*, 541 F. App'x 653, 659 (6th Cir. 2013); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001))). "Accordingly, summary judgment is appropriate only when a rational trier of fact could not properly find for the nonmoving party." *Duncan v. Anderson Cnty., Tenn.*, No. 3:20-CV-8-TAV-HBG, 2020 WL 7774905, at *1 (E.D. Tenn. Dec. 30, 2020) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989) (observing that "[w]here the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party, there is no genuine issue for trial") (citation and internal quotation marks omitted)).

"In determining whether a dispute is 'genuine,' the court cannot weight the evidence or determine the truth of any matter in dispute." *Dugger*, No. 2:18-CV-00185-SKL, 2020 WL 12862727 at *5 (citing *Anderson*, 477 U.S. at 249). Instead, the Court "must view the evidence in the light most favorable to the non-moving party." *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020). The moving party bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Duncan v. Anderson Cnty., Tenn.*, No. 3:20-CV-8-TAV-HBG, 2020 WL 7774905, at *1 (E.D. Tenn. Dec. 30, 2020). Even viewing facts in this deferential light, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *E. Tennessee Nat. Gas, LLC v. .32 Acres in Jefferson Cty., Tenn.*, No. 3:13-CV-47, 2013 WL 5555044, at *1 (E.D. Tenn. Oct. 7, 2013) (citing *Curtis Through Curtis v. Universal Match Corp.,* 778 F. Supp. 1421, 1423 (E.D. Tenn.1991) (citing *Celotex*, 477 U.S. at 317)). The Supreme Court has warned that the "mere existence of a scintilla of evidence" will not be sufficient to overcome a summary judgment motion. *Anderson*, 477 U.S. at 252. Rather, "the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute." *Dugger*, No. 2:18-CV-00185-SKL, 2020 WL 12862727 at *5 (citing *Celotex,* 477 U.S. at 330 n.2). Stated another way, the non-moving party must demonstrate "there is more than 'some metaphysical doubt as to material facts.'" *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). In undertaking this analysis, the Court is cognizant that "[t]he judge's function is not himself to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Koshani*, 374 F. Supp. 3d at 701–02 (internal citations omitted).

## III.    LEGAL ANALYSIS

"Owners and occupiers of business premises have a duty to maintain their premises in a safe manner . . .." *Plunk v. Nat'l Health Investors, Inc*., 92 S.W.3d 409, 414 (Tenn. Ct. App. 2002). Under Tennessee law, "[t]o establish a prima facie case for premises liability based upon negligence, the plaintiff must prove (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant that was below the standard of care, amounting to a breach of a duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation." *Trentham v. Mid-Am. Apts., LP*, 705 S.W.3d 151, 160 (Tenn. 2025).

To establish duty, a plaintiff must show that "(1) the condition was caused or created by the owner, operator, or his agent, or (2) if the condition was created by someone other than the owner, operator, or his agent, that the owner or operator had actual or constructive notice that the condition existed prior to the accident." *Penn v. Wilderness Dev. Corp*., No. 25-5139, 2025 WL 2993747, at *2 (6th Cir. Oct. 24, 2025). Under Tennessee law, "when a dangerous condition occurs regularly, the premises owner is on constructive notice of the condition's existence. This places a duty on that owner to take reasonable steps to remedy this commonly occurring dangerous condition." *Blair v. West Town Mall*, 130 S.W.3d 761, 766 (Tenn. 2004). The Tennessee Supreme Court has further explained that "constructive notice may be established by a showing that a 'dangerous condition resulted from a pattern of conduct, a recurring incident, or a general or continuing condition,' such that 'its presence was reasonably foreseeable to the premises owner.'" *Trentham*, 705 S.W.3d at 162; *Blair v. West Town Mall*, 130 S.W.3d 761, 766 (Tenn. 2004) ("[A] past history of a recurring event or condition makes that event or condition foreseeable.").

"It is well settled that it is the rare negligence case that can be resolved by summary judgment." *Reidinger v. Trans World Airlines, Inc.*, 463 F.2d 1017, 1021 (6th Cir. 1972). Furthermore, "just as with the question of negligence generally, 'allocating fault is essentially a fact question,' best left to the jury unless 'the proof is so clear that reasonable minds could not disagree.'" *O'Connell v. Walmart Stores East, LP*, No. 2:19-cv-00059, 2021 WL 679272, at *3 (quoting *Henley v. Amacher*, No. M1999-02799-COA-R3-CV, 2002 WL 100402, at *7 & n.1 (Tenn. Ct. App. Jan. 28, 2002); *Wilson v. TMBC, LLC*, No. W2013-01907-COA-R3CV, 2014 WL 2191992, at *6 (Tenn. Ct. App. May 27, 2014).

### A. Existence of Dangerous or Hazardous Condition

Here, Wal-Mart asserts that Plaintiff cannot identify any evidence that any water or hazardous substance was on the vestibule floor before she fell and that no other witness identified any water or hazardous condition on the floor before the fall. [Doc. 50 p. 8]. Wal-Mart asserts that Mr. Krieger "could not describe any puddle, accumulation, or visible wetness," and "expressly testified that he did not see water where Plaintiff fell or along the area where she allegedly slid." [Doc. 50 p.9]. Wal-Mart points to the fact that Ms. Clevenger walked through the vestibule approximately eleven minutes prior to the fall and observed no water and that no other people entered the vestibule between the time Ms. Clevenger exited the vestibule and Plaintiff's fall. [Doc. 50 p. 10]. Wal-Mart also asserts that the surveillance video shows that the vestibule floor was dry and free of any visible liquid or hazard prior to Plaintiff's fall and that the photographs of the scene showing water were taken post-incident. [Doc. 50 p. 9].

Wal-Mart, however, has ignored the evidence in Plaintiff's favor, and in considering Wal-Mart's motion, the Court is required to view the evidence in the light most favorable to her as the non-moving party. *See*, *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d

852, 859 (6th Cir. 2020). For example, Plaintiff testified about how she "was sliding and I was on the water, because the way that I fell, I flew." [Doc. 50-1 p. 84-85]. Furthermore, Wal-Mart has mischaracterized Mr. Krieger's testimony. Although Mr. Krieger did not describe what he saw as puddles of water, he clearly testified that he observed water on the floor and described it as a sheen like when "you wash your floors at home with a mop, you know what it looks like when it's damp. But these were - - you could see there was just little pockets of water on the floor." [Doc. 50-2 p. 32]. When asked if the sheen was a foot long, Mr. Krieger stated that "[i]t could have been. It could have been six inches long. The floor was wet all in that area." [Doc. 50-2 p. 32]. He further testified: "when I picked her up and put her in my arms, I looked down and - - I wanted to make sure, you know, she wasn't bleeding or anything. I could see that the floor was wet." [Doc. 50-2 p. 45]. When asked about his wife sliding and if he saw "any water in a - - like a trail of water?" Mr. Krieger stated: "I didn't see a trail of water, but I saw that the floor was wet." [Doc. 50-2 p. 53]. Thus, the assertion made by Wal-Mart that Mr. Krieger "expressly testified that he did not see water where Plaintiff fell or along the area where she allegedly slid," is inaccurate. [Doc. 50 p.9].

Based upon the testimony noted above, the fact that photographs showing water were not taken until after the fall and after the wet cart was brought inside for Plaintiff to sit on is immaterial. It would be a rare case indeed for photographs documenting conditions at an incident site to be taken just prior to an incident. Furthermore, the surveillance video simply does not show a view of the floor sufficient to support Wal-Mart's assertion that the floor was dry and free of visible liquid. The fact that photographs and observations of water on the floor are post-incident do not prove that there was no water or other dangerous substance on the floor when Plaintiff fell.

**B. Causation**

Wal-Mart also asserts that Plaintiff cannot establish that a hazardous condition caused her fall. [Doc. 50, p.12]. Wal-Mart claims that the surveillance video shows that Plaintiff entered with wet footwear, walked across mats, and then stepped off the mats into the center of the vestibule before falling. [Doc. 50, p. 13]. Wal-Mart asserts that at least nine other customers walked through the same area without incident. [Doc. 50, 13]. Furthermore, Wal-Mart again points to the fact that the only "documented" water at the scene "appeared after the fall." [Doc. 50, p. 13]. Wal-Mart contends that this evidence "defeats any inference that an alleged condition" caused Plaintiff's fall as opposed to Plaintiff's own wet rain boots. [Doc. 50, p. 13]

As discussed above, the Court is required to view the evidence in the light most favorable to Plaintiff as the non-moving party. *See*, *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020). Plaintiff and her husband have both provided testimony about water being on the floor and the manner in which Plaintiff slid and fell. Additionally, Mr. Radebach has opined that if there had been water on the rain boots Plaintiff was wearing it would likely have been absorbed by the mat Plaintiff walked across as she entered the vestibule. Multiple people, including Wal-Mart employees, testified that the vestibule floor could pose a hazard when wet, that even a slight amount of water could cause a hazard, and that it was reasonably foreseeable for people to enter through the exit door near where Plaintiff fell and where no mats had been placed. Ms. Belcher testified that because it was foreseeable for people to enter through the exit door, mats should have been placed between the exit doors as well as between the entry doors. Given this testimony, there are genuine disputed issues of material fact. As such, the Court cannot find as a matter of law that Plaintiff is unable to prove causation.

**C. Creation or Notice of a Dangerous Condition**

For the same reasons as discussed above, Wal-Mart's assertion that Plaintiff cannot satisfy the requirement for creation or notice fails. Wal-Mart has ignored that there is testimony in the record that could support a reasonable jury finding that water on the floor caused Plaintiff's fall. Ms. Belcher testified that she had been trained to know that any amount of water on the floor could make the surface slippery and that someone could fall in just a couple of drops of water. She also testified that water on the tile in the vestibule can create a significant slip risk and that water dripping from umbrellas could cause an unsafe condition in the vestibule, which could "cause a slip and fall." [Doc. 63-17 p. 73]. Ms. Winstead also testified that a small amount of water on the vestibule floor could cause the floor to be slippery and pose a hazard. Ms. Belcher testified about the Wal-Mart maintenance team's responsibilities for placing mats in the vestibule because the vestibule "does get really slick in there without rugs. So, it is easy to slip and fall . . .." [Doc. 63-17 p. 25-26]. Ms. Belcher testified that mats should have been placed between the exit doors so that there would have been carpeted mats all the way between the two exit doors. Three Wal-Mart employees testified that it was foreseeable for customers to enter through the door marked 'Do Not Enter.' Wal-Mart does not have its employees stop people from entering through the exit door. "Constructive notice may be established by a showing that a 'dangerous condition resulted from a pattern of conduct, a recurring incident, or a general or continuing condition,' such that 'its presence was reasonably foreseeable to the premises owner,'" and evidence exists that within the year preceding Plaintiff's fall, two similar slip incidents in the Wal-Mart vestibule caused by water on the floor due to rain were reported. *Trentham*, 705 S.W.3d at 162; *Blair v. West Town Mall*, 130 S.W.3d 761, 766 (Tenn. 2004) ("[A] past history of a recurring event or condition makes that event or condition foreseeable.").

**D. Comparative Fault**

Finally, Wal-Mart asserts that no reasonable jury could find Wal-Mart more at fault than Plaintiff in this action. In Tennessee, "so long as a plaintiff's negligence remains less than the defendant's negligence the plaintiff may recover; in such a case, plaintiff's damages are to be reduced in proportion to the percentage of the total negligence attributable to the plaintiff." *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992). "'[A]llocating fault is essentially a fact question,' best left to the jury unless 'the proof is so clear that reasonable minds could not disagree.'" *O'Connell v. Walmart Stores East, LP*, No. 2:19-cv-00059, 2021 WL 679272, at *3 (quoting *Henley v. Amacher*, No. M1999-02799-COA-R3-CV, 2002 WL 100402, at *7 & n.1 (Tenn. Ct. App. Jan. 28, 2002); *Wilson v. TMBC, LLC*, No. W2013-01907-COA-R3CV, 2014 WL 2191992, at *6 (Tenn. Ct. App. May 27, 2014).

Wal-Mart asserts that Plaintiff said she slipped on her rain boots, and for that reason, no jury could find that she that she was less than fifty percent at fault. However, that fundamental fact is disputed. Although Ms. Belcher testified that Plaintiff reported to her that she slipped on her rain boots, Plaintiff testified that she does not believe she said this to Ms. Belcher. Plaintiff goes on to explain in her deposition why she does not believe that it was slipping on her boots that caused her to fall. A reasonable jury could choose to believe Plaintiff's testimony over that of Ms. Belcher. Furthermore, while Plaintiff's action in stepping off the mat and onto the tile floor could implicate fault on her part, given the disputes regarding genuine issues of material fact as to liability, applicable law indicates that what percentage of fault Plaintiff bears is a question best left to the jury.

## IV. CONCLUSION

For the reasons set forth above, genuine disputed issues of material fact exist as to each legal issue raised by Defendant. Accordingly, Defendant's Motion for Summary Judgment [Doc. 49] must be **DENIED**.

SO ORDERED:

/s/Cynthia Richardson Wyrick
United States Magistrate Judge